Our last case this morning is Streck v. Ravgen, 23-1989, similar claim but a different file-off. Mr. Dustin, when you're ready. Good morning, Your Honor. Good morning, Your Honors. May it please the Court, Thomas Dustin on behalf of the appellant, Streck. I would like to take up the formaldehyde issue first, then briefly address the misapplication of the motivation to combine with respect to Pertol, Chu, and Granger, and then take the Court's questions on the standing issue. Now, the undisputed evidence, Your Honors, was that formaldehyde use to prevent cell lysis in combination with PCR remained common at the time of the invention and for decades before. Notwithstanding, published concerns with respect to its toxicity and reports of random damage to nucleic acids. In fact, Your Honors, there were no studies that specifically informed a person of skill in the art that formaldehyde was any less suitable for PCR analysis of cell-free nucleic acids. The Board acknowledged that there was no evidence, no data, specific to formaldehyde's use prior to the patent with either cell-free DNA or cell-free fetal DNA. Now, Rabgen contends that a person of skill in the art would have expected formaldehyde to react differently with cell-free DNA as opposed to cellular DNA. On appeal, they assert that the Board agreed with that proposition. They assert that the Board relied on evidence that cell-free fetal DNA was small, more limited in quantity, and easily damaged. Now, I submit to Your Honors that the Board did not make those findings. But had the Board made those findings, those findings would have been legal error, Your Honors, because the statements relied upon for the proposition that cell-free fetal DNA is small and easily damaged were statements made in 2017 in a declaration that was 15 years after the fine with patent application. And for support for the statements in that declaration, that declaration cited articles and studies that occurred after the filing of the patent application. These were not studies, these were not characteristics or properties of cell-free fetal DNA in this record that were known to persons of skill in the art before the filing of the patent application. Counsel, why don't you address the prior art, Pirtle and Granger? Yes, Your Honor. So, Your Honor, the Board erred in requiring that Streck establish that Pirtle motivated a person of skill in the art, that it made the suggestion not only of the problem that needed to be solved, but the solution to that problem. And that is not the law of this circuit, Your Honor. The primary reference need not provide the motivation. The motivation can come from virtually anywhere, from teachings, knowledge of skill of the art, etc. And as we pointed out in our petition, a person of skill in the art viewing Pirtle would have realized that Pirtle was complaining, was citing as a problem background DNA. Background DNA can out-compete fetal DNA for amplification, and so background DNA should be minimized or eliminated. Chu taught us what was the source of the background DNA. Chu taught us that through its experimentation, it localized the source of this maternal background DNA to the lysis of maternal cells that were in the sample. And it did that by removing the cells, the maternal cells from the sample, and then showing that by doing that, by preventing the lysis of those cells, the total background DNA in the sample was reduced considerably. Now, all of these facts were undisputed, Your Honor. Now, the problem that the board had with Chu was not only did they ignore the teachings of Chu, that by preventing maternal cell lysis, you would reduce background DNA and therefore enhance the technique that Pirtle was describing, but it required us to show that by means of preventing maternal lysis, that we would achieve some substantial and considerable improvement in the reduction of background DNA. They pointed to evidence that we showed from Ravjin's own expert during deposition, who read Pirtle as a person of skill in the art, would read Pirtle, looked at the data that Pirtle reported, and testified that Pirtle, I'm sorry, I misspoke, Chu's data, looked at Chu's data and spoke to the issue of what a person of skill in the art would understand Chu was telling you when you read his data or her data. But Granger discloses formaldehyde, right? It does, Your Honor. And that's the question, whether it should have been combined. And we know, listening all morning, that formaldehyde can damage DNA. We do, Your Honor, but here's the point. And so you're relying on the combination of Pirtle and Granger. We are, Your Honor. And the point I'm making is that before the patent was filed, no one knew that you could expect any more disqualifying damage from formaldehyde to cell-free DNA than was expected with respect to cellular DNA. Formaldehyde interacted with both types of DNA. And after all, cell-free DNA is merely cellular DNA that is outside the cell. So what the art taught was that up until the time of the invention, it was common to use formaldehyde in combination with DNA that was going to undergo PCR analysis. And there was nothing in the record other than the relative quantities of cell-free DNA versus cellular DNA that would teach a person of skill in the art that the properties of cell-free DNA would cause it to react any differently to formaldehyde than the known, most common, most sought-after, most acceptable fixative in use at that time for these types of PCR analyses. That's the point, Your Honor. There is nothing in the record. PCR simply amplifies. It is. It is, Your Honor. Absolutely right. It's not operative otherwise. It amplifies DNA. And that's exactly the point. That's what the board did not provide. It did not consider any of the evidence concerning how PCR actually operates. The testimony of Dr. Patterson in the record about the fact that... The question is formaldehyde. PCR amplifies, but that doesn't prevent lysis of cells. The formaldehyde prevents lysis of cells, Your Honor. Yes. But it causes... It's subject to leakage. Well, no, there is no evidence in this record, Your Honor, of leakage from cells caused by formaldehyde. I heard that, frankly, for the first time here today as to the LabCorp record. This record has no evidence in this record that formaldehyde causes leakage from cells. In fact, if anything, the record in this proceeding, Your Honor, establishes just the opposite. Because as Dr. Patterson testified, and as his article at appendix 3105 and 1307, and 1308, and again at 15980, these references teach that the most common use, the most common fixative for what was called in situ PCR, which is where you keep the DNA inside the cell and you amplify it inside the cell. You have to maintain the integrity of the cell to conduct in situ PCR. The DNA has to remain in it. Formaldehyde was used to fix those cells in order to conduct that type of PCR. So the DNA remains in the cell. It has to for that particular type of PCR. And formaldehyde was commonly used for that particular type of PCR. And that's the evidence in this record. There is no evidence that formaldehyde will cause any DNA to escape the cell, Your Honor. The board credited Dr. Van Ness' testimony that one of the skills would have been dissuaded from modifying Pearl's method with Granger's formaldehyde. That's its conclusion, right? That is, that was the conclusory statement contained in one of two paragraphs, only one of two paragraphs cited by the board in connection with its final written decision. The board said we are unpersuaded that Granger's RNA amplification would have suggested success with amplification and detection of rare cell-free fetal DNA isolated from maternal plasma in Pearl. Well, Your Honor, I think that was a statement with respect to whether or not Granger taught or was the motivation to use cell-free, use formaldehyde in a cell-free context. We don't rely on Granger for that. Granger teaches that formaldehyde will fix cells and that its presence in samples is not incompatible with DNA or nucleic acids. The board said it is not apparent that Granger was amplifying and detecting a scarce analyte, rare nucleic acid sequences, against a background of excess sequences amplified like Pearl. That is correct, Your Honor. In the study reported in Granger, he was testing his concept against cellular RNA to determine whether or not the cellular RNA was adversely affected by the presence of formaldehyde. But remember, Granger's ultimate goal was to provide a preservative solution for the analysis of blood samples looking for the detection of AIDS virus. So Granger was interested in using a preservative solution, Your Honor, that was intended for a very rare analyte, the AIDS virus. And he saw no incompatibility with his use of formaldehyde in that particular context, Your Honor. I'm into my rebuttal time, but let me just make a couple more points. I apologize, Your Honor, I didn't know that alarm was on. Let me make a couple more points about formaldehyde. So, as I said, the only evidence in this record of the differences between cell-free and cellular DNA in terms of its reaction to formaldehyde, in terms of PCR, is that cell-free DNA, cell-free fetal DNA, is less in quantity than cellular DNA. Now, the reality is that what the board did not grapple with was the fact that there was no evidence of the degree to which formaldehyde would damage cell-free fetal DNA, whether that damage would be sufficient in the view of a person of skill in the art to disqualify formaldehyde for PCR amplification, when all that is required for PCR amplification is a very small amount of DNA that is then replicated or amplified into billions of copies. So, the other point that also wasn't grappled with was the board did not consider that by adding formaldehyde, you not only, in addition, reduce the maternal component in the sample, the component that Pertle said could out-compete the relatively lesser amount of fetal DNA. So, what you're getting with formaldehyde is you're reducing the component that out-compete the fetal DNA, and you're not damaging the fetal DNA in such a way that you're going to prevent its amplification. Counsel, as you pointed out, you're into your rebuttal time. I assume you want to save some. I do, Your Honor. I want to make just one more point, though, and that is the board specifically found in this record that PCR would not be adversely affected by formaldehyde. It rejected the evidence that Ravjen presented on that and noted that Dr. Patterson persuasively explained that the steps involved in PCR amplification, particularly this protease digestion step, would reverse any cross-linking that might impede PCR analysis. So that's in this record. I didn't hear that in the lab report. I'll reserve the remainder of my time here. We'll save it. Mr. Matty's doing heavy duty today. Last one. Thank you, Your Honor. May it please the Court. So, here the appellant is taking a scattershot approach, disputing virtually every facet of the board's decisions below and ultimately asking this Court to reweigh the evidence, which this board does not do. The PTAB took a careful approach here under the proper obviousness framework to reach its decisions, and in this one they took three important steps to get to their ultimate conclusions. First, the board considered Streck's prior art collectively and explained how Streck and its expert repeatedly overstated the disclosures in its prior art. Second, the board examined whether the Granger-formaldehyde combination would have been a suitable option, again, without requiring that it be perfect or that it be the most desirable. And third, the board performed a detailed analysis of all the evidence presented and explained why, on balance, the evidence failed to establish obviousness under KSR. So, on the first point regarding PERTOL and CHEW, for PERTOL, the board went through step-by-step and responded to Streck's arguments regarding motivations that PERTOL itself was providing, according to Streck, and it responded on each of those and found that Streck was overstating the PERTOL reference. And importantly, I think the board didn't just stop there. In some of its briefings, Streck faults the board for supposedly requiring motivation to come only from PERTOL or for focusing only on PERTOL. The board didn't do that. What they did was they responded to Streck's arguments regarding PERTOL, but then they said, after they had addressed PERTOL, at Appendix 67, quote, this is not the end of the inquiry, because petitioner also had cited CHEW. So they weren't putting some heightened burden on motivation to just come out of PERTOL. They responded to Streck's arguments on PERTOL, and then they acknowledged that's not the end of the inquiry. They had to take into account the other motivations, purported motivations, that had been put forth. So then the board addressed CHEW and this argument that CHEW supposedly disclosed a 25% fetal DNA recovery level, and Streck there accuses the boards of applying an arbitrary threshold to what they were required to show in the prior art. But again, this isn't the board putting in an arbitrary threshold or any threshold at all. They were just responding to Streck's argument. Streck said there's 25% in CHEW, and the board responded squarely to that. And it found that argument to be unsupported and actually contradicted by some of the shifting that Streck and its expert did between the petition and the reply in this case. If you do the arithmetic, as Streck does in his brief, from CHEW's figures, I guess it's three and four, you can reach a conclusion, struck me, that 25% is an accurate figure. Now, CHEW didn't reach that conclusion, and I gather that no one reached that conclusion for a few years after CHEW. But nonetheless, it does appear that the math adds up to 25%. Is that right? Yes. The arithmetic that is in the briefing, we don't take issue with if you divide one number by the other and multiply it by the third, you get 25. But we do take issue with that being a proper calculation or a calculation that CHEW or anyone of skill in the art appreciated back at the time of this invention. I can understand the failure to appreciate it, but why is it not a proper calculation? I mean, if CHEW had sat down and said, and by the way, if you compare these two figures, you end up with 25%. That wouldn't have been improper, right? For CHEW to draw that conclusion from the figures. If CHEW said that, then that would have been what CHEW discussed. The problem is the figures is the starting point. As Streck's expert admitted, it's hard to read the figures. It's hard to tell. These numbers that go into the equation aren't written in the figures. You have to sort of guesstimate. That's where, as the board noted at Appendix 47, Patterson actually called it a bad graph. He said if you're reviewing this, he would have asked for a new one. Maybe more to your honor's question, if CHEW had really gotten 25% and appreciated that, they would have been singing that from the rooftops. What CHEW, as the board acknowledged at page 70, CHEW did not disclose the calculations or report 25%. Instead, what CHEW and others actually and repeatedly reported, both in CHEW, before CHEW, and in years after CHEW, was the 3% to 6% recovery. On this shifting between petition and reply, Dr. Patterson actually agreed with us on this. In the petition itself, in his opinion that he put in to support the petition at the first step of this case, at Appendix 2977, paragraph 97 of his opinion, Dr. Patterson said at the start of the case, CHEW reported 3% to 6%. Again, at his deposition after institution, we asked him. We wanted to make sure. CHEW and Lowe, those references were on the table in front of him. At Appendix 15180 to 81, he agreed what CHEW and Lowe in the early 2000s were reporting was 3% to 6%. The board noted that not only is there a failure of support here, but also there's some shifting, even in the expert's own testimony, as far as what a person of ordinary skill in the art would have appreciated from CHEW. Then the second step the board took. The board went and examined the Grainger combination. It did that here explicitly in the context of whether Grainger would have been a, quote-unquote, suitable combination. Just as it did with Pirtle and CHEW, the board proceeded to step through and address Streck's proposed motivations to combine the Grainger reference. The main one Streck put forward here was what they call the shipping motivation, that one of ordinary skill would have been motivated to use Grainger to allow shipping samples between laboratories. The board noted that those assertions were simply unsupported in the record. They had cited Dr. Patterson's opinion that merely repeated what the attorney argument was in the briefing. They dismissed that additional argument for Grainger. In determining Grainger here, again, it's critical. The board never required that remote shipping or Grainger's formaldehyde or anything in this combination be superior or perfect to any other approach. At Appendix 75, the board took that head on. They said, we know the law. We know what we're supposed to do. We're performing the proper analysis. The board says it was not suggesting that a person of ordinary skill must choose only the best solution, but merely it must be a suitable combination based on the record evidence. The board put the standard right there in their decision. They applied the proper inquiry here, and they performed the proper analysis. If counsel for Streck write that in this record, as opposed to the other ones we've been looking at this morning, there's no evidence that formaldehyde causes leakage in cells or adversely affects PCR, or that its toxicity might discourage its use. Is the record different here in that regard? In some respects. There is evidence in this record of leakage and toxicity. I will agree with counsel that, unlike in the previous decision, here the board did not have a second separate DNA leakage rationale for its decision. It didn't rely on that. Here what the board did is, it went back to what we've been talking about, the DNA damage points, and rested its decision here on a person of ordinary skill being dissuaded from the combination because of formaldehyde's potential to damage DNA. With the Bianchi reference not in this record in this case, because that's the reference that seemed to most clearly refer to the leakage issue, the permeability issue, call it. Right. I'll be honest, Your Honor, I don't remember if it was in the record. It was not in the same way. That's for sure. All right. So what the board did is they carefully, again, weighed both sides' evidence on this DNA damage question and ultimately found at Appendix 87 here, a person of ordinary skill would have been dissuaded from adding Granger's formaldehyde to Pertol because formaldehyde was known to damage nucleic acids. And similar to the cases that we've heard before, the board relied on expert testimony, in addition with the underlying evidence that was in the record regarding formaldehyde's potential to damage DNA. They credited Dr. Van Ness' opinion regarding a person of ordinary skill being dissuaded. They referenced the Srinivasan reference. They referenced the Swenberg reference that disclosed the formaldehyde's potential to damage DNA. And again, the board did all of this, as they did in the other decisions, in the important context of cell-free DNA analysis, which was in the claims. They noted, again, the testimony from Streck's Mr. Hunsley, which I know counsel talked about. I want to respond to a couple points that he made. I think Streck is trying to distance themselves from Mr. Hunsley's statements regarding cell-free DNA being small and the quantities being limited, easily damaged. And what we heard was those statements were made later in 2017. I actually think that context is very important here, because when Streck filed their own patent to cover using a formaldehyde releaser in cell-free DNA analysis, they argued in 2010 that wouldn't have been obvious. That's totally at odds with what they're arguing here, that that combination somehow would have been obvious back in 2003. And Mr. Hunsley, in his testimony, he put what he was saying squarely in the context of the invention we're talking about here. In the background of his declaration, he cites to the discovery of free fetal DNA in the late 1990s and puts everything in the context of this burgeoning field of cell-free fetal DNA analysis. I don't think Streck can just dismiss the testimony from their own VP of R&D based on the fact that he signed a paper in 2017. Then, turning last to Granger, the board here noted, again, in the important context of cell-free fetal DNA analysis, Granger uses formaldehyde, but it didn't use it in the context of what is claimed here. As the board found in Appendix 83 to 84, Granger was describing intracellular nucleic acids, and ultimately, even with all of Granger's disclosures, as the board found in Appendix 85, it was unpersuaded that Granger would have suggested success with amplification and detection of rare cell-free fetal DNA isolated from maternal plasma and PERTL. Again, rooting its decision, not just in PERTL and what it was about, but in the specific context of this claim that requires determining the sequence of DNA that is isolated, of cell-free fetal DNA, that is isolated from a maternal sample. Ultimately, here the board walked through every motivation that Streck had offered. It considered countervailing evidence from RavGen, rebutting each point. It made no legal error in its analysis. Its findings were supported by substantial evidence, and thus we request that the board's decision be affirmed. Unless your honors have further questions for me, I'll stop there. Thank you, Counselor. Mr. Dustin has a little time. Thank you, your honors. Quickly, there was mention of 3-6% and repeated recognitions that that was the reported amount of cell-free fetal DNA. That simply was statements that Lowe had reported in 1998, that 3-6% cell-free fetal DNA was found. That's not consistent with the testimony with respect to Chu. Chu clearly showed that it was able to achieve a greater cell-free fetal DNA fraction within the sample by the processing techniques it used. Are you talking about the 25%? The 25%, yes, your honors. But Chu did not... Chu didn't do the calculation, yes. And nobody seemed to have done it for several years to come up with 25%. Well, I would point out that Dr. Van Ness presented with a copy of the Chu article. He had read it, he had studied it, he had opined on it. When he was presented with the graphs, that was exactly the interpretation he gave. The question is, would a person of skill in the art reading Chu have said, aha, 25%? Well, the question is not so much whether they would have said 25%, but would they have said that if I reduce paternal cell lysis... With respect to the particular question of 25% versus 3-6%, a person of ordinary skill reading Chu would say Chu accepts 3-6%. No, I disagree with that, your honor. His jumping off point is, if I don't process these samples, if I don't do anything to them, 3-6% is what you get. Let's take a look at what happens when I process them to eliminate lysis. Now I've got graphs showing that I improved the fraction of cell-free DNA in the sample considerably. And that's what he says, or that's what Chu says in the article, your honor. With respect to leakage, your honor, if you search these briefs, if you search the appendix, you're not going to find the word leakage anywhere. The Yankee was not a reference, was it, in this record? No. But Yankee does seem to talk about permeation of the cell walls, right? I'm not familiar with the reference, because it was not a reference in this particular record. All I would say, your honor, is coming back to appendix 16991-16992, is the testimony of Dr. Patterson with respect to in-situ PCR, where the integrity of the cell has to be maintained, and it is maintained by formaldehyde. No DNA is released. Do you have a final statement? Yes, your honor, I do. The unfortunate thing is we are the tenth in line on these IPRs. I think what may have happened in this process was that by the time we arrived before the board, we had to combat fatigue and inertia and momentum towards a decision that had been replicated over and over again before our particular evidence was presented to the board. I think what happened here was we made arguments here with respect to the untimeliness, the lack of prior art disclosures, and the fact that PCR was practiced with respect to formaldehyde, that the digestive steps would have corrected the problems that were reported in these earlier IPRs. By the time we arrived, we were at the whim of the motion, the momentum, the inertia that had happened. All I would say, your honor, is in this record, in terms of how the board has failed to grapple with all of this evidence with respect to how formaldehyde would not have caused someone to avoid its use, even in cell-free fetal DNA applications, the fact that they didn't grapple with all of the evidence that is counter to their conclusions, I think doesn't give this court much of a record to really determine whether or not there's substantial evidence supporting that. I would at least urge this court, or suggest to this court, that it remand this matter back to the board to do more comprehensive and more complete finding that your honors could then evaluate as to whether or not that evidence is there. Thank you. Thank you, counsel. We will grapple with whatever is before us. Case is submitted.